# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### November 15, 2005 Session

## STATE OF TENNESSEE v. ERIC BERRIOS

### Appeal from the Criminal Court for Shelby County
### No. 04-03042    Paula Skahan, Judge

---

### No. W2005-01179-CCA-R9-CD - Filed March 3, 2006

---

Before the court is an interlocutory appeal by the State, pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. The defendant, Eric Berrios, moved to suppress evidence seized during a search of his automobile. The trial judge concluded that the evidence had been illegally seized and granted the motion to suppress. We affirm the judgment of the trial court and remand this case for further proceedings.

#### Tenn. R. App. P. 9; Judgment of the Criminal Court is Affirmed and Remanded.

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J.C. MCLIN, JJ., joined.

William D. Massey, Memphis, Tennessee, for the Appellee, Eric Berrios.

Paul G. Summers, Attorney General & Reporter; Mark A. Fulks, Assistant Attorney General; William L. Gibbons, District Attorney General; and Valerie Smith, Assistant District Attorney General, for the Appellant, State of Tennessee.

### OPINION

This case involves a Hispanic male who was operating an automobile with a Texas license tag on Interstate 40 and driving eight miles over the speed limit, when he was stopped by a Shelby County drug interdiction officer, ordered out of his vehicle, frisked, detained for approximately 43 minutes in the locked back seat of the officer's cruiser, and handcuffed and formally arrested after the officer drilled into the body of the defendant's vehicle and discovered cocaine. The defendant moved to suppress the cocaine, and after a hearing, the trial court granted the defense motion to suppress. Aggrieved by the ruling, the state has perfected an interlocutory appeal in an effort to persuade this court that no constitutional infirmity compromised the integrity of the seizure. As we shall explain, we are not so persuaded.

# I. SUPPRESSION HEARING

The trial court conducted a suppression hearing on January 7 and 20, 2005. Shelby County Deputy Sheriff Kelly Nichols, the officer who stopped the defendant's vehicle, testified as a state's witness that he was assigned to the West Tennessee Drug Task Force and primarily "work[ed] interdiction on I-40." He explained his assignment involved "stopping violators and looking beyond the ticket for signs of criminal activity."

On February 25, 2004, at approximately 7:30 p.m., Deputy Nichols observed the defendant traveling through a construction zone at 53 miles per hour; the posted speed zone for the area was 45 miles per hour. The deputy followed the defendant's vehicle and activated his emergency equipment. The defendant pulled his vehicle to the side of the road and stopped. Deputy Nichols testified that he approached the vehicle and "asked for [the defendant's] license, registration and insurance, items of that nature," which the deputy routinely requested in automobile stops. The deputy recalled the weather conditions as cold and slightly rainy. He asked the defendant to step away from his vehicle and to sit in the back of the patrol car; the deputy's claimed reason for doing so was the defendant's safety and his own safety because officers are "more likely to be run over by vehicles than shot and killed by a suspect."

In response to the state's question, Deputy Nichols denied that the defendant was free to leave at that point; the reason for the detention was "[b]ecause [the deputy] had just initiated the stop . . . [and] had not ran any computer checks on [the defendant], or the vehicle." Deputy Nichols testified that the point of the computer check was to check on the defendant and his license status and to determine if the vehicle was properly registered and not stolen. The deputy maintained that, as an officer, he had discretion whether to contact the local authorities for the information or contact the U.S. Customs Service. The deputy said that he followed his common practice and contacted the U.S. Customs Service in Gulfport, Mississippi, regarding the defendant.

While Deputy Nichols waited to hear from the U.S. Customs Service, he began questioning the defendant, who was still confined in the rear seat of the patrol car. The deputy testified that he "inquired about [the defendant's] travel itinerary" and asked the defendant "a few basic questions." The deputy said that the defendant "basically" told him that he was "coming from Houston going to Baltimore, to an area around Baltimore, Maryland, on business and that he was in the import, export business." Deputy Nichols testified that the defendant spoke fluent English and appeared to understand the questions.

The state inquired about the defendant's behavior, and the deputy testified that in the beginning he noticed that the defendant's hands were "shaking" when he produced his license, registration, and insurance papers. According to the deputy, as the defendant was sitting in the back of the patrol vehicle, the defendant would not maintain eye contact when questioned. Also, the defendant's "leg was visibly shaking." From this behavior, the deputy concluded that the defendant's "nervousness was increasing."

Without identifying a time frame, Deputy Nichols testified that at one point he asked the defendant to consent to a search of the defendant's vehicle and presented the defendant with a written consent-to-search form, which the defendant signed. The deputy then began searching the vehicle. To keep in communication with the defendant during the search, Deputy Nichols gave the defendant the speaker microphone to his patrol unit.

Deputy Nichols testified that during the course of searching the interior and exterior of the vehicle, he came upon something unusual. He explained, "Upon opening the hood of the vehicle, I observed that all of the bolts holding the fenders on had recent tool marks on them. They had obviously been removed for some reason." Deputy Nichols said this discovery indicated to him that he should search for a possible hiding place for contraband or U.S. currency. First, however, the deputy returned to the patrol car and asked the defendant if the vehicle had been in an accident. The defendant told the deputy that the door had been damaged and that his girlfriend "had run over something, or something to that nature, on the front end, causing the fenders to have to be removed."

The state inquired if the deputy received a call from U.S. Customs during the search. The deputy responded that he had; U.S. Customs reported a "return on [the defendant's] license, the vehicle registration and also that the vehicle had crossed the U.S./Mexico border the previous day." That information, Deputy Nichols testified, represented "another indicator of possible criminal activity that [he] need[ed] to look even closer to the reason why those fenders had been removed." Deputy Nichols estimated that the traffic stop had been proceeding approximately 20 minutes at that point.

Deputy Nichols decided to enlist the help of another officer, Sergeant Mike McCord. Deputy Nichols contacted the sergeant because the sergeant had a "narcotics detecting canine" and had "experience in searching vehicles." With Sergeant McCord's assistance and after the dog indicated the presence of drugs in the defendant's automobile, Deputy Nichols drilled into the vehicle and found 33 pounds of cocaine hidden inside the firewall of the vehicle. The defendant declined to make a statement and requested to speak to an attorney.

Deputy Nichols was shown and identified a video tape of the defendant's stop and arrest. The deputy's cruiser was equipped with a camera that activated either manually or automatically whenever the deputy turned on his blue lights. The record reflects that the video tape was played for the court.

The defense meticulously cross-examined Deputy Nichols. Deputy Nichols testified that the sole reason for stopping the defendant's vehicle was the speeding violation; the defendant was not driving erratically, and the equipment on the vehicle appeared to be operating properly. Deputy Nichols agreed that at the time he initiated the stop, he had no suspicion that any other criminal activity was involved. Likewise, the deputy saw nothing inside the car that raised a safety concern or suggested other criminal activity.

Deputy Nichols saw nothing facially invalid or suspicious about the defendant's driver's license. The vehicle, however, was not registered to the defendant, and the defendant explained that the registered owner was his girlfriend. Although somewhat reluctant to do so, Deputy Nichols ultimately conceded that driving another person's vehicle and speeding is "[n]ot necessarily" an indicator of crime. When the defendant complied with the deputy's request to get out of his car, Deputy Nichols admitted there was nothing about his appearance that led him to suspect that the defendant had a weapon. Nevertheless, the deputy frisked the defendant for weapons because the deputy "intended to put [the defendant] in the back seat of the car." Deputy Nichols claimed not to know how often he ordered stopped motorists out of their vehicles in connection with routine traffic stops. He said that if he did not observe any type of nervous or criminal indicators by a motorist, he would either return to his patrol car and write a ticket or terminate the stop.

The defense replayed several times the portion of the video tape that captured the first few minutes of the traffic stop. The defense asked Deputy Nichols to identify where on the video tape the defendant's hands were shaking or he was exhibiting any signs of nervousness. Deputy Nichols responded that he was not looking for nervous indicators after the defendant got out of his vehicle and that any such indicators would not be "picked up by the video." The court interrupted to ask the deputy to clarify whether or not he could see any signs of nervousness on the video tape. Deputy Nichols conceded that he "did not see any on the video tape."

The video tape disclosed that, after the defendant was secured in the rear seat of the police vehicle, the deputy asked the defendant whether he owned the vehicle. The defense pointed out that questioning the defendant about the vehicle had no connection with having stopped the defendant for speeding. The deputy agreed that the question was unrelated to speeding. He testified that he asked the question "[j]ust to see if there [were] any other indicators of criminal activity" and because the registration paperwork did not list the defendant as the owner. Deputy Nichols also agreed that he was looking for indicators of criminal activity when he asked about the defendant's girlfriend and how long she had owned the car, the girlfriend's whereabouts, the defendant's driving destination, the length of his planned stay in Maryland, and any outstanding tickets. After questioning the defendant about those topics, Deputy Nichols then told the defendant that he was "going to run some checks on his license."

Deputy Nichols testified that he had been trained to ask questions and to engage motorists in conversations to look for criminal indicators. He maintained that he was not trained to ask the questions before requesting a license check; rather, it was strictly up to him "[a]s to where and when" to make the inquiries unrelated to the reason for the initial stop. Also, the deputy testified that he had complete discretion in choosing which agency to contact for a license check. He agreed that U.S. Customs could supply information, such as whether a vehicle had crossed the border, that local law enforcement could not provide.

The video tape disclosed that after the deputy contacted U.S. Customs, but before he received any information from that source, he engaged the defendant in conversation about the defendant's business and ownership of the business. During that conversation, Deputy Nichols

began filling out a consent-to-search form. He testified that based on the defendant's nervousness, he "had already decided that [he] was going to ask [the defendant] for consent to search the vehicle." Deputy Nichols elaborated as follows: "I had suspicions that there was something going on, other than just a speeding violation. I mean, it was obvious to me that [the defendant] was nervous, for some other reason, than just being stopped for speeding." Asked directly by the defense whether he detected any other criminal indications other than nervousness, Deputy Nichols replied, "None that I found significant."

As a prelude to the automobile search, the deputy asked the defendant if he had any contraband or other illegal items in the car. Deputy Nichols never advised the defendant of his rights. Deputy Nichols secured the defendant's verbal permission to search the vehicle, inquired whether the defendant's luggage was in the trunk, and then obtained the defendant's signature on a consent-to-search form that identified the property to be searched as "2000 Chevy Malibu and all contents." After repeated defense questioning, Deputy Nichols testified that he was looking specifically for drugs or large amounts of currency.

Aided by a flashlight, Deputy Nichols first searched the interior of the defendant's vehicle and found no contraband or illegal items. He next searched the trunk and the defendant's luggage. That search uncovered nothing suspicious or incriminating, and Deputy Nichols agreed that the luggage contents were consistent with an individual traveling from Houston to Baltimore. The search progressed to the engine compartment, and based upon the fender bolts, Deputy Nichols called and summoned Sergeant McCord to the scene and then returned to his police cruiser and began questioning the defendant about the fenders and about crossing the border in the vehicle.

When Sergeant McCord arrived, both men inspected the engine compartment of the defendant's vehicle for several minutes. As part of the search, Deputy Nichols retrieved a socket set from the trunk of his cruiser and waited for Sergeant McCord to lead his narcotics-sniffing dog around the defendant's vehicle. Deputy Nichols agreed that he did not know if anything illegal was in the vehicle; he was operating from what he described as his "personal belief through experience and training that [the fender] area was concealing some type of illegal substance." At that point, approximately 30 minutes had elapsed since the defendant was stopped.

Deputy Nichols testified he did not know the exact time frame when he received the report back from U.S. Customs. He assumed that U.S. Customs contacted him before he summoned Sergeant McCord to the scene, and he believed that he obtained the defendant's consent to search before hearing from U.S. Customs. In response to questions from the trial court, Deputy Nichols testified that U.S. Customs contacted him by calling his cellular telephone and that he received the call at some point after he began searching the vehicle. Deputy Nichols did recall that U.S. Customs reported that the defendant's driver's license was valid and that the vehicle had not been stolen. As for why he did not terminate the search at the point he received the information from U.S. Customs, Deputy Nichols testified, "Because I had [the defendant's] consent and I continued to search the vehicle for contraband."

Deputy Nichols did not see the dog react positively to the defendant's car, and he disclaimed any law enforcement training as a drug-dog handler. Sergeant McCord evidently advised him that the dog had detected the presence of narcotics. According to Deputy Nichols, he and Sergeant McCord had difficulty trying to access the fender compartment. They concluded that the entire fender would need to be removed, but they rejected that course of action because the vehicle was on the side of the road. Instead of removing the fender, Sergeant McCord retrieved a drill with a long bit and drilled directly into the fender. Deputy Nichols handcuffed and formally arrested the defendant 43 minutes after the initial traffic stop.

On redirect examination, the state tried to assert inevitable discovery as an exception to the search warrant requirement. Deputy Nichols was asked about "after market compartments." He described such a compartment as "an area either added on, or modified to conceal illegal narcotics, weapons, or transactions from drug proceeds." The state next inquired as to Deputy Nichols' legal understanding regarding a vehicle containing an "after market compartment." He testified that he understood the vehicle would be "seizable under Tennessee law." Deputy Nichols then agreed with prosecution counsel that even if he had not drilled into the vehicle, he would have seized it after discovering the after market compartment.

On recross-examination, the defense honed in on why Deputy Nichols did not allow the defendant to remain in his own vehicle while the deputy returned to his cruiser and checked on the defendant's license. Deputy Nichols gave several explanations, including that he "observed that [the defendant] was nervous and [he] wanted to explore that option, further," that he "wanted to see if [the defendant's] nervousness continued to escalate, or if it would decrease as the stop continued," that he was concerned with "safety" and wanted the defendant "in a safe area," and that he did not know whether the defendant had any weapons inside his vehicle.

Last, the defense inquired further about the legal basis for an officer to seize a vehicle that has an after market compartment. Deputy Nichols testified that he was relying on "Tennessee Civil Law" in terms of a "civil forfeiture . . . [i]f [he] believe[d] it's used for trafficking narcotics, or the proceeds for narcotics."

Compared to Deputy Nichols' testimony, Sergeant Michael McCord's testimony was relatively brief. At the time of the defendant's stop, he was assigned as a drug-dog handler to the West Tennessee Judicial Drug Task Force. He utilized a black Labrador retriever named "Jax," who was a certified drug detection dog. Sergeant McCord explained that he and the dog recertify every year in April. He described Jax as an "aggressive indicator," meaning the dog "has an aggressive bark and scratch and [the dog will] sometimes bite the car when he smells the odor of narcotics."

Sergeant McCord testified about his involvement with the defendant's stop and explained what was transpiring as the video tape was played for him. He described one portion of the video tape as showing Jax scratching the side of the car and barking aggressively. At one point, the dog actually jumped inside the vehicle, and Sergeant McCord testified that the dog was "down

with his nose in the fire wall and floor pan of the driver's seat area." Sergeant McCord then returned the dog to his vehicle.

Cross-examination of Sergeant McCord consisted primarily of an argumentative exchange between the witness and defense counsel regarding the video tape and how to interpret the dog's movements. Sergeant McCord insisted that he did not "pull" the dog's leash to direct him to the front left of the vehicle.

At the conclusion of Sergeant McCord's testimony, the state rested, and the defense elected to offer no testimony on the suppression issue. The trial court took the matter under advisement pending submission of briefs of the parties.

## II. ORDER GRANTING MOTION TO SUPPRESS

On April 20, 2005, the trial court issued a written memorandum and order granting the defendant's motion to suppress. In pertinent part, the court found and made the following rulings, which we summarize:

- The initial stop of the defendant was not unreasonable and did not violate the Fourth Amendment based on the undisputed evidence that Nichols observed the defendant's car violating the speed limit.

- After placing the defendant in the back seat of the police cruiser, Nichols began asking a series of questions, only some of which related to the speeding offense for which the defendant was stopped. Many questions were unrelated to speeding, obtaining documents from the defendant, or officer safety, and these questions were clearly posed before Nichols began writing either a ticket or warning citation.

- Nichols did not initiate the computer check on the defendant's license and registration until approximately two minutes after placing the defendant in the back of the squad car and four minutes after initiating the traffic stop. After the call to U.S. Customs, Nichols continued for four minutes to ask questions unrelated to the speeding offense.

- Nichols' questions exceeded both the *duration* and *subject matter* of the stop.

- Contrary to the state's argument, the defendant's responses to the officer's questions were an insufficient basis for extending the detention.

- The only possible indicator of criminal activity that Nichols testified to observing was the defendant's nervousness. Nervousness alone is seldom sufficient for finding reasonable suspicion, and although it could suffice under certain circumstances, those circumstances are not present in this case.

- From numerous viewings of the video tape of the traffic stop, the court cannot credit Nichols' testimony that the defendant appeared nervous at the beginning of the stop and that the nervousness escalated. Nothing about the defendant's appearance on camera suggested that he was nervous enough to raise a reasonable suspicion of criminal activity, and the court finds no evidence of extreme nervousness in the sound of the defendant's voice as he answered Nichols' questions.

- Any nervousness that the defendant did exhibit was likely a result of being locked in the backseat of a police car while Nichols retained his driver's license. The defendant not only did not feel free to leave, but he was physically unable to do so, and any nervousness under those circumstances was normal.

By separate supplemental order entered May 20, 2005, the trial court explained that by oversight, the issue of the validity of the defendant's consent was not addressed. The trial court framed the issue as whether the defendant's consent to search his vehicle was voluntary and vitiated the prior unlawful detention or represented the fruit of the poisonous tree. In pertinent part, the court found and made the following rulings, which we summarize:

- If consent to search is obtained after an illegal seizure, the evidence seized must be suppressed unless the consent is both voluntary and sufficiently attenuated from the illegal seizure such that the consent is the product of an intervening act of free will.

- The defendant's consent was given unequivocally and free of duress and coercion. Nichols explained the consent form in a non-threatening, professional, and courteous manner. There

-8-

is no evidence that the defendant was confused, and Nichols requested permission to search only one time.

- Factors used to evaluate whether the primary taint of an unlawful seizure has been disconnected from the voluntary consent include (1) the temporal proximity of the illegal seizure and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct.

- The consent to search in this case was given immediately after the defendant had been questioned on matters beyond the scope of the traffic stop and while the defendant was kept in the back seat of the police car.

- There were no intervening circumstances.

- The defendant's detention was a process designed to exploit the underlying traffic stop, culminating in the asking for and receiving consent to search the vehicle.

- The state failed to carry its burden of demonstrating that the consent was sufficiently attenuated from the unlawful detention.

## III. BURDEN OF PROOF AND STANDARD OF APPELLATE REVIEW

We begin by observing that "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). That is, a trial court necessarily indulges the presumption that a warrantless search or seizure is unreasonable, and the burden is on the state to demonstrate that one of the exceptions to the warrant requirement applied at the time of the search or seizure. *Id.*

Because stopping an automobile and detaining its occupants unquestionably constitute a seizure, it follows that, when the state seeks to introduce in a criminal trial evidence obtained as a result of the warrantless stop of an automobile, the state carries the burden of demonstrating the applicability of an exception to the warrant requirement. *See, e.g.*, *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005) (temporary detention of an individual during a traffic stop constitutes seizure that implicates the protection of both the state and federal constitutions); *State v. Keith*, 978 S.W.2d 861, 865 (Tenn. 1998).

Once the trial court has ruled on a suppression motion, our standard of appellate review requires acceptance of the trial court's findings regarding "questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence," unless the evidence preponderates against the findings. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Cothran*, 115 S.W.3d 513, 519 (Tenn. Crim. App. 2003). The application of the law to the facts found by the trial court is, however, a question of law that is reviewed de novo. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000); *Yeargan*, 958 S.W.2d at 629; *Odom*, 928 S.W.2d at 23.

## IV. REASONABLENESS OF THE DETENTION

We glean from the record that Deputy Nichols relied upon the defendant's consent to justify his warrantless search of the car, and in the state's brief on appeal, it also relies upon consent as a basis for overturning the suppression order. Indeed, the defendant's signature on the consent form led to the deputy's search under the car hood, which led to the discovery of the disturbed bolts, which in turn led to the dog sniff and further searches. As a prelude to examining the validity of the consent, however, we must first review the constitutional status of the defendant's detention at the time the consent form was signed.

Based on Deputy Nichols' observations that the defendant was operating his vehicle in violation of the speed limit, the trial court correctly found that the initial stop of the defendant's vehicle was constitutionally reasonable. The trial court did not, however, analyze the deputy's subsequent actions in ordering the defendant out of his vehicle, frisking the defendant for weapons, and placing the defendant in the back seat of the police cruiser. Instead, the trial court identified the "main issue" as being "whether Nichols' interrogation of Defendant after pulling him over exceeded the 'reasonable scope' of the stop's original purpose." We believe the trial court should have first evaluated the reasonableness of the deputy's actions *before* he interrogated the defendant.

### A. The "Frisk and Sit"

We have carefully reviewed the videotape of the traffic stop and subsequent detention. The video tape discloses that once the vehicles were stopped and parked on the side of the interstate, Deputy Nichols approached the open window on the driver's side and addressed the defendant, "Hello. License, please. License and registration." The defendant is seen making movements to retrieve the documents, which he then hands to Deputy Nichols. Deputy Nichols glances only momentarily at the papers, and without pausing, he motions with his finger for the defendant to get out of the vehicle, addresses the defendant, "Eric, come on back here for me, so I can run some checks on your license," and walks to the area between the two vehicles. The defendant follows, and Deputy Nichols frisks the defendant and directs him to sit in the back of the patrol vehicle.

As we shall explain, Deputy Nichols' actions, in our opinion, were constitutionally unreasonable and exceeded the authority extended to law enforcement officers conducting routine

traffic stops. It is undisputed, and Deputy Nichols so testified, that he had no particularized or objective basis to believe that the defendant was armed or dangerous. The deputy testified that he frisked the defendant for weapons solely because he "intended to put [the defendant] in the back seat of the car."

As the defendant correctly maintains, the speeding offense for which he was stopped is a Class C misdemeanor. Tenn. Code Ann. § 55-8-152 (Supp. 2003). Pursuant to Tennessee Code Annotated sections 40-7-118 and 55-10-207(f), when an officer observes the commission of certain misdemeanors, the officer is required to cite and release the misdemeanant in lieu of effecting a custodial arrest. Tenn. Code Ann. §§ 40-7-118(b)(1) (2003), 55-10-207(f) (Supp. 2003). "Accordingly, the Tennessee 'cite and release' statute creates a presumptive right to be cited and released for the commission of a misdemeanor." *State v. Walker*, 12 S.W.3d 460, 464 (Tenn. 2000).[1] A custodial arrest in violation of the "cite and release" statute constitutes a violation of the right against an unreasonable search and seizure. *See id*. at 467.

To be sure, the deputy's initial stop for speeding in this case was not unreasonable. Likewise, consistent with *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S. Ct. 330 (1977), the officer could, as a matter of course, order the defendant driver to exit his vehicle. The Supreme Court explained its reasoning in *Mimms* in the following fashion:

> [W]e need presently deal only with the narrow question of whether the order to get out of the car, issued after the driver was lawfully detained, was reasonable and thus permissible under the Fourth Amendment. This inquiry must therefore focus not on the intrusion resulting from the request to stop the vehicle or from the later "pat-down," but on the incremental intrusion resulting from the request to get out of the car once the vehicle was lawfully stopped.
>
> Placing the question in this narrowed frame, we look first to that side of the balance which bears the officer's interest in taking the action that he did. The State freely concedes the officer had no reason to suspect foul play from the particular driver at the time of the stop, there having been nothing unusual or suspicious about his behavior. . . . The State argues that this practice was adopted as a precautionary measure to afford a degree of protection to the officer. . . .
>
> We think it too plain for argument that the State's proffered justification–the safety of the officer–is both legitimate and weighty. . . .

---

[1] There are eight exceptions to the "cite and release" statute that require an officer to effect a custodial arrest in lieu of issuing a citation. Tenn. Code Ann. § 40-7-118(c)(1)-(8) (2003). None of those exceptions apply in this case.

-11-

The hazard of accidental injury from passing traffic to an officer standing on the driver's side of the vehicle may also be appreciable in some situations. Rather than conversing while standing exposed to moving traffic, the officer prudently may prefer to ask the driver of the vehicle to step out of the car and off onto the shoulder of the road where the inquiry may be pursued with greater safety to both.

Against this important interest we are asked to weigh the intrusion into the driver's personal liberty occasioned not by the initial stop of the vehicle, which was admittedly justified, but by the order to get out of the car. We think this additional intrusion can only be described as *de minimis*. . . . The police have already lawfully decided that the driver shall be briefly detained; *the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it.* Not only is the insistence of the police on the latter choice not a "serious intrusion upon the sanctity of the person," but it hardly rises to the level of a "'petty indignity.'"

434 U.S. at 109-11, 98 S. Ct. at 332-33 (quoting *Terry v. Ohio*, 392 U.S. 1, 17, 88 S. Ct. 1868, 1877 (1968)) (emphasis added).

*Mimms* cannot be read as permitting routine, suspicionless frisks of automobile occupants stopped for traffic violations. The authority to frisk remains circumscribed by the dictates of *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968), in which the Supreme Court approved the limited and temporary seizure of a person for questioning and for a "pat-down" for weapons if an officer has a reasonable suspicion that the person is armed and dangerous. *Id*. at 26-28, 88 S. Ct. at 1882-83. *Terry* did not approve a "pat-down" for weapons as standard procedure. *See State v. Fred Arthur Stier*, No. W1999-600-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Jackson, Apr. 7, 2000).

In addition, we do not interpret *Mimms* as authorizing an officer, as a matter of routine, to order a detained motorist to sit in the back of a police cruiser. The Supreme Court in *Mimms* described the *de minimus* intrusion of ordering a driver out of a vehicle solely in terms of having the driver stand alongside his vehicle as opposed to remaining in the driver's seat.

We are not suggesting that it is unreasonable for a police officer to pat-down a person when the officer is justified in placing the person in the back of a police vehicle. The legitimacy of that procedure, though, depends on the legitimacy of placing the person in the police car in the first place. From the testimony and evidence in this case, we discern that Deputy Nichols did not frisk or place the defendant in the patrol vehicle as a convenience to preparing and issuing a speeding citation. Likewise, it does not appear that the frisk and confinement in the patrol vehicle objectively facilitated the records check submitted to U.S. Customs.

-12-

In his testimony, Deputy Nichols settled upon three reasons why he frisked the defendant and placed the defendant in the back seat of the police cruiser. The first reason was "to explore the option of [the defendant's] nervousness to see if it escalated, or decreased." The second reason was the safety of the deputy and the defendant, and the third reason was not knowing whether the defendant had any weapons inside his vehicle. Deputy Nichols claimed not to know how often he has ordered stopped motorists out of their vehicles. He did, however, testify that if he did not observe any type of nervous or criminal indicators by a motorist, he would either return to his patrol car and write a ticket or terminate the stop.

We are not prepared to endorse Deputy Nichols' practice of frisking and requiring a driver to sit in the back seat of his patrol vehicle based on his subjective belief that a driver appears nervous. Frisking and confining a driver in the back seat of a police vehicle are substantial intrusions on personal liberty, which Deputy Nichols justified in this case by testifying, "I wanted to see if his nervousness continued to escalate, or if it would decrease as the stop continued." That justification and Deputy Nichols' practice amount to little more than the exercise of standardless and unfettered discretion far exceeding a minimal intrusion into a driver's personal liberty. *See Terry*, 392 U.S. at 24-25, 88 S. Ct. at 1881-82 ("Even a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security."). Furthermore, the trial court specifically considered and rejected Deputy Nichols' testimony that the defendant manifested signs of nervousness at the beginning of the stop, which escalated. The evidence does not preponderate against the trial court's finding on this matter. *See Ross*, 49 S.W.3d at 839; *Odom*, 928 S.W.2d at 23.

Simply stated, Deputy Nichols had probable cause to issue a citation to the defendant for speeding. Any further intrusion was unlawful[2] unless the deputy was

> able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion[,] . . . [a]nd in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?

---

[2] In our opinion, it is no answer to say that frisking the defendant disclosed nothing incriminating, thereby offsetting any harm resulting from the additional intrusion. A search is a search even if it happens to disclose nothing but the body shape of the detainee. *See Arizona v. Hicks*, 480 U.S. 321, 325, 107 S. Ct. 1149, 1153 (1987) (holding that police officer's actions in moving stereo equipment came within the purview of the Fourth Amendment as a "search" independent of the search which was justified by the exigent circumstances validating the entry of the apartment and pointing out, "A search is a search, even if it happens to disclose nothing but the bottom of a turntable.").

*Terry*, 392 U.S. at 21-22, 88 S. Ct. at 1880. In our view, approving Deputy Nichols' "frisk and sit" policy based on his subjective assessment of a driver's nervousness effectively dispenses with *Terry*'s requirement of objective articulable facts. In addition, such a practice could easily transform every routine traffic stop into an encounter more akin to a custodial arrest than an investigative detention, contrary to the general constitutional assessment of such stops. *See Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S. Ct. 3138, 3150 (1984) ("[T]he usual traffic stop is more analogous to a so-called '*Terry* stop' . . . than to a formal arrest."). Accordingly, we are unable to conclude that Deputy Nichols' actions, predicated on the defendant's alleged and uncorroborated nervousness, were constitutionally reasonable.

Because Deputy Nichols also cited safety concerns, we now consider whether those concerns justified the placement of the defendant into the patrol car, which in turn justified the preceding frisk. To be sure, the safety of police officers is recognized as "legitimate and weighty." *Mimms*, 434 U.S. at 110, 98 S. Ct. at 333. Accordingly, if placing a driver in the patrol vehicle prevents an officer or the driver from being exposed to a dangerous condition, that intrusion could be constitutionally reasonable. Nevertheless, the "touchstone" is always "'reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Id*. at 108-09, 98 S. Ct. at 335 (quoting *Terry*, 392 U.S. at 19, 88 S. Ct. at 1878-79).

Deputy Nichols had difficulty articulating the nature of his safety concern. He testified, "[I]f I have [the defendant] in a safe area where I feel safe with me, I feel that we're both safe. Not just him, not just me." Deputy Nichols admitted that the road area where he stopped the defendant was as safe as can be found on an interstate.

We are at a loss to fathom how Deputy Nichols' "frisk and sit" enhanced either his or the defendant's safety given the existing circumstances. The defendant was traveling alone; therefore, no need arose to separate the defendant from passengers in the stopped vehicle. Because the police cruiser would most likely be the first car struck by approaching traffic, we fail to perceive any safety-based reason why the defendant would be safer sitting in the back of the police cruiser as opposed to remaining in the driver's seat of his own vehicle.

As for Deputy Nichols' personal safety, he claimed that he wanted "[the defendant to be] in an area where [the deputy] knew that there were no weapons inside the vehicle, versus were he sitting inside his [car], where it was unknown at that time." He added, "It's just a precaution. I mean, it prevents any type of incident like that from happening." In the absence of specific and articulable facts, however, an officer is not constitutionally authorized to frisk and seize motorists for the sake of precaution.

Our ruling in this case should not be read as disparaging the safety of law enforcement officials or as introducing some novel, per se prohibition in the context of warrantless seaches and seizures. Constitutional reasonableness is necessarily fact specific and objectively assessed. In this case, absent testimony establishing objective and articulable facts, we break no new ground by

rejecting Deputy Nichols' hunches, precautions, and sheer curiosity as sufficient to pass constitutional muster.

## B. Duration and Scope of the Traffic Stop

The trial court's suppression ruling in this case was predicated on the principle that a reasonable traffic stop can become unreasonable and constitutionally invalid if the time, manner, or scope of the investigation exceeds the proper parameters. *See Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325-26 (1983); *State v. Troxell*, 78 S.W.3d 866, 871 (Tenn. 2002); *State v. Simpson*, 968 S.W.2d 776, 783 (Tenn. 1998). That is, the duration of such a stop must be "temporary and last no longer than necessary to effectuate the purpose of the stop." *Troxell*, 78 S.W.3d at 871. Moreover, the officer's conduct during an investigative stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20, 88 S. Ct. at 1879. "[T]he proper inquiry is whether during the detention the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Troxell*, 78 S.W.3d at 871.

"[N]o hard-and-fast time limit exists beyond which a [traffic stop] detention is automatically considered too long and, thereby unreasonable." *State v. Justin Paul Bruce*, No. E2004-02325-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Knoxville, Aug. 22, 2005); *cf. United States v. Sharpe*, 470 U.S. 675, 685, 105 S. Ct. 1568, 1575 (1985) ("if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop"). Simply put, a law enforcement officer making a valid traffic stop must not prolong the stop for longer than necessary to process the traffic violation without having some reasonable suspicion of other criminal activity sufficient to warrant prolonging the stop. Likewise, no inflexible constitutional guidelines dictate a law enforcement officer's conduct during a traffic stop. Instead, the inquiry is necessarily factually intensive and overlaid with the state's burden of proof regarding a warrantless search and seizure.

The state directs our attention to various rulings, for instance, that traffic stops lasting 10, 20, 35, 45, 50, 60, or 75 minutes are not constitutionally unreasonable. We have examined these decisions, and in our opinion they underscore the factually intensive nature of the issue. *See Gallegos v. City of Los Angeles*, 308 F.3d 987 (9th Cir. 2002) (civil rights action; detention calculated solely to ensure that officers had the correct suspect and resulted in plaintiff's prompt vindication); *United States v. Gil*, 204 F.3d 1347 (11th Cir. 2000) (necessary for agents to detain the defendant to prevent her from jeopardizing the investigation of the defendant's residence); *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999) (officers' inquiries and safety precautions reasonably related to basis for stopping car to investigate involvement in shooting); *United States v. McCarthy*, 77 F.3d 522 (1st Cir. 1996) (excessive length of defendant's detention arose not because officers engaged in dilatory tactics but, instead, because investigative efforts to determine if defendant involved in robbery failed to dispel suspicion giving rise to the stop); *United States v. Vega*, 72 F.3d 507 (7th Cir. 1995) (agents had reasonable belief that defendant was involved in massive cocaine conspiracy and was dangerous; part of 62-minute detention

consisted of waiting for narcotics dog to arrive); *United States v. Bloomfield*, 40 F.3d 910 (8th Cir. 1994) (after stopping vehicle for abrupt lane change, officer developed reasonable suspicion the defendant was transporting drugs based on multiple factors, such as shaking hands, heavy breathing, red eyes, two radar detectors on dashboard, drug-masking odor, evasive answers, and refusal to answer some questions); *United States v. French*, 974 F.2d 687 (6th Cir. 1992) (after truck was stopped for weaving, officers smelled odor of marijuana emanating from rear of truck; officers had reasonable suspicion to investigate and reasonably waited on narcotics detection canine that was 50 miles away at the time of the call), *overruled in part on other grounds by United States v. Ferguson*, 8 F.3d. 385 (6th Cir. 1993).

In addition, the state essentially portrays what happened in this case as a garden-variety traffic stop occasioned by the routine inquiries incident to such a stop. In its brief, the state writes,

> [T]he questions about the defendant's residence and employment were related to the traffic stop because this information is necessary for issuance of an enforceable citation. Deputy Nichols' questions were asked merely to obtain the type of information needed to find the defendant should he fail to satisfy the obligation imposed by the citation. Moreover, contrary to the trial court's conclusion, the questions asked by Deputy Nichols are in fact routine. . . . Furthermore, the trial court's conclusion that Deputy Nichols employed "fishing expedition-type questions" is without foundation in either the evidence or the law. There is nothing unreasonable about any of the questions posed and the questions did not exceed the scope of the traffic stop.

Inasmuch as Deputy Nichols never began writing a speeding citation and inasmuch as Deputy Nichols plainly testified that the questions unrelated to speeding were intended to ferret out *indicators of other criminal activity*, we find the state's argument unpersuasive.

Our research discloses no clear consensus or guidance regarding how police questioning at the scene of an otherwise typical traffic stop precisely impacts the time, manner, or scope of the investigative detention. Relying on *State v. Gonzalo Moran Garcia,* No. M2000-01760-CCA-R3-CD (Tenn. Crim. App., Nashville, Feb. 20, 2002), *rev'd on other grounds*, 123 S.W.3d 335 (Tenn. 2003), the state forcefully insists that the questions posed by Deputy Nichols are in fact routine and consistent with the lawful scope of a routine traffic stop. We note, however, that *Gonzalo Moran Garcia* pointed out that "courts have disagreed about whether a police officer's questioning of a motorist on a subject unrelated to the purpose of the traffic stop violates the Fourth Amendment even when the questioning does not prolong the initial valid seizure." *Gonzalo Moran Garcia*, slip op. at 22 (citations to various conflicting decisions).

In this case, the trial court focused on Deputy Nichols' asking questions on matters unrelated to the traffic stop before commencing the computer check and thereby unreasonably prolonging the defendant's detention. By the trial court's estimation, Deputy Nichols did not initiate the computer check on the defendant's license and registration until 7:43:30 p.m., two minutes after placing the defendant in the back of the police vehicle and four minutes after initiating the traffic stop. Essentially, the trial court concluded that the two-minute questioning exceeded the scope of the circumstances justifying the traffic stop.

Considering all of the circumstances of the particular invasion of the defendant's security in this case, we conclude that Deputy Nichols' questioning was not constitutionally significant, and we, therefore, part company with the trial court on that issue. Nevertheless, having concluded that the "frisk and sit" that preceded the questioning was unreasonable, we affirm the conclusion that the detention that was in progress at the time of signing the consent form was unlawful.

## V. CONSENT AND ATTENUATION

The state in this case maintains that the defendant's voluntary consent to the search of his automobile justified the warrantless seizure of the narcotics. We, therefore, turn our attention to that argument.

It is well settled that a search conducted pursuant to a voluntary consent is an exception to the requirement that searches and seizures be conducted pursuant to a warrant. *State v. Bartram*, 925 S.W.2d 227, 230 (Tenn. 1996). That is, although the Fourth Amendment and Article I, section 7 of the Tennessee Constitution condemn unreasonable searches and seizures, they recognize the validity of voluntary cooperation. *Florida v. Bostick*, 501 U.S. 429, 439, 111 S. Ct. 2382 (1991); *Schneckloth v. Bustamonte*, 412 U.S. 218, 243, 93 S. Ct. 2041 (1973) (holding that "there is nothing constitutionally suspect in a person[] voluntarily allowing a search"); *Cox*, 171 S.W.3d at 184. The sufficiency and validity of consent depend largely upon the facts and circumstances presented by each particular case. *State v. Jackson*, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993).

"[C]ourts have recognized three distinct types of police-citizen interactions: (1) a full scale arrest which must be supported by probable cause; (2) a brief investigatory detention which must be supported by reasonable suspicion; and (3) brief police-citizen encounters which require no objective justification." *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000) (citations omitted). In *United States v. Drayton*, 536 U.S. 194, 122 S. Ct. 2105 (2002), the Supreme Court determined that no Fourth Amendment violation occurs when an officer simply approaches a person in a public place and poses a question. Even when there is no basis to suspect a crime, officers may ask questions, ask for identification, and *ask for consent to conduct a search*, so long as the means used to induce the cooperation are not coercive. *Id*. at 201, 122 S. Ct. at 2110; *see Daniel*, 12 S.W.3d at 425. The encounter, in other words, is regarded as consensual and requires no reasonable suspicion; it will not

trigger constitutional scrutiny unless it loses its consensual nature. *See Bostick*, 501 U.S. at 434, 111 S. Ct. 2385.

The consent at issue in this case did not arise in the context of a brief police-citizen encounter. Deputy Nichols clearly had seized the defendant. In that situation, to satisfy the constitutional reasonableness standard, the consent must be "'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" *State v. Simpson*, 968 S.W.2d 776, 784 (1998) (quoting *State v. Brown*, 836 S.W.2d 530, 547 (Tenn. 1992)). Moreover, even if the consent is voluntary, evidence seized in the search will not be admissible (1) if the initial detention was unlawful or thereafter became unreasonable and (2) if the consent was an exploitation of the prior unlawful seizure. *See State v. Garcia*, 123 S.W.3d 335, 346 (Tenn. 2003).

As we explained earlier, in our opinion Deputy Nichols' search and seizure of the defendant was constitutionally unreasonable. That said, the question becomes one of attenuation – that is, whether the consent, even if voluntary, was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S. Ct. 407, 416-17 (1963).

"The existence of consent and whether it was voluntarily given are questions of fact" involving an examination of the totality of the circumstances in each case. *State v. Ashworth*, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999); *see State v. McCrary*, 45 S.W.3d 36, 43 (Tenn. Crim. App. 2000). The trial court found from the totality of the circumstances that the defendant's consent in the instant case was given unequivocally and free of duress and coercion. The trial court pointed out that Deputy Nichols explained the consent form in a non-threatening, professional, and courteous manner, that there was no evidence that the defendant was confused, and that Deputy Nichols requested permission to search only one time. In our opinion, the evidence does not preponderate against the trial court's finding.

Regarding attenuation, the supreme court in *State v. Garcia*, 123 S.W.3d 335 (Tenn. 2003), summarized the applicable principles as follows:

> We have previously noted that attenuation issues are highly factual. *See State v. Huddleston*, 924 S.W.2d 666, 674 (Tenn. 1996). In making our evaluation, we look to the factors articulated by the Supreme Court in *Brown v. Illinois*, 422 U.S. 590, 603-04, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975). Though the *Brown* factors were designed to aid courts in determining whether a confession was obtained by exploitation of an illegal arrest, these factors may also be used by courts to evaluate whether the causal connection between an unlawful seizure and a subsequent consent has been broken, i.e. whether the primary taint of an unlawful seizure has been sufficiently attenuated from the voluntary consent. The *Brown* factors are as follows: 1) the temporal proximity of the illegal seizure and consent;

> 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the official misconduct. *Id.* Additionally, we note that the burden of showing attenuation lies with the State. *See Brown*, 422 U.S. at 604.

*Garcia*, 123 S.W.3d at 346 (footnote omitted).

The trial court correctly recognized and applied the factors set forth in *Garcia*. The court found that the consent was given immediately after the defendant had been questioned on numerous matters and while he was still confined to the back seat of the police cruiser and unable to leave. The trial court, therefore, concluded that no appreciable time elapsed between the defendant's detention (which we have concluded was unreasonable) and the consent that would have allowed the taint of the misconduct to dissipate. We discern no error in the trial court's analysis, and we agree that this temporal-proximity factor weighs against a finding of attenuation.

The trial court further found, with abundant support in the record, that there were no intervening circumstances, such as Deputy Nichols' communicating to the defendant that he was free to leave. *See Garcia*, 123 S.W.3d at 347 ("Thus, while we acknowledge the fact that Garcia was told he was free to go, we give this factor little weight given the immediacy with which Officer Kohl began questioning the defendant after telling him he was free to leave and the presence of the other police cruiser."). Consequently, this factor also counsels against a finding of attenuation.

Last, the trial court considered the purpose and flagrancy of the official misconduct. The court concluded that "Nichols' detention was a process designed to exploit the underlying traffic stop, culminating in the asking for and receiving of consent to search the vehicle." As support for its conclusion, the trial court pointed out (1) that although there was no reasonable suspicion that the defendant was carrying on any criminal activity other than the speeding offense, the deputy confined the defendant in the back of the patrol car, kept the defendant's license, and subjected him to several minutes of "fishing-expedition" type questions before seeking consent to search, and (2) that the deputy never issued the defendant either a warning or citation ticket for speeding. Pursuant to our earlier analysis, we give little weight to the questions posed by Deputy Nichols; however, we assign significant weight to Deputy Nichols' disregard for needing reasonable and particularized suspicion prior to the "frisk and sit." *See also Garcia*, 123 S.W.3d at 347 (pointing out that the officer's status as a member of the drug task force added to the likelihood that the prolonged and unreasonable detention of the defendant was for the sole purpose of obtaining consent to search his vehicle). Deputy Nichols' actions weigh against a finding of attenuation.

In summary, and under the particular circumstances of this case, we conclude that the defendant's consent was gained in exploitation of the unlawful detention and that the state failed to demonstrate that the consent was sufficiently attenuated from the unlawful detention.

## VI. CONCLUSION

To summarize, we hold that the "frisk and sit" of the defendant in this case constituted an unreasonable search and seizure that was not based upon reasonable suspicion in violation of the Fourth Amendment and Article I, section 7 of the Tennessee Constitution. We also hold that although the defendant's consent to search was given voluntarily, the evidence seized must be suppressed because the consent was not sufficiently attenuated from the unlawful detention. Consequently, we affirm the trial court's suppression.

_____
JAMES CURWOOD WITT, JR., JUDGE